# EXHIBIT 2

```
                          84ORSECH.txt
                                                                      1
      84orsech
  1   UNITED STATES DISTRICT COURT
  1   SOUTHERN DISTRICT OF NEW YORK
  2   ------------------------------x
  2
  3   SECURITIES AND EXCHANGE
  3   COMMISSION,
  4
  4              Plaintiff,
  5
  5         v.                                05 Civ. 2192 (WHP)
  6
  6   NORTHSHORE ASSET MANAGEMENT,
  7   LLC, et al.,
  7                                           Hearing
  8              Defendants.
  8
  9   ------------------------------x
  9                                           New York, N.Y.
 10                                           April 24, 2008
 10                                           10:00 a.m.
 11   Before:
 11
 12        HON. WILLIAM H. PAULEY III
 12                                           District Judge
 13
 13
 14        APPEARANCES
 14
 15
 15   JACK KAUFMAN, ESQ.
 16   SAMUEL M. FORSTEIN, ESQ.
 16   LINDA CHATMAN THOMSEN, ESQ.
 17   TIMOTHY P. WEI, ESQ.
 17   MARK K. SCHONFELD, ESQ.
 18   Attorneys for Plaintiff
 18        U.S. Securities and Exchange Commission
 19
 19   STILLMAN, FRIEDMAN & SHECHTMAN, P.C.
 20        Attorneys for Defendant Saldutti
 20   JULIAN W. FRIEDMAN, ESQ.
 21   CAROLYN BARTH RENZIN, ESQ.
 21
 22   KAYE SCHOLER LLP
 22        Attorneys for Receiver Arthur Steinberg
 23   PAUL J. CURRAN, ESQ.
 23   KARIN E. GARVEY, ESQ.
 24
 24   ARTHUR STEINBERG
 25        Receiver
 25
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                      2
      84orsech
  1        (Case called)
  2             THE COURT: Good morning. Please be seated. Would
  3   counsel for the SEC give their appearances.
  4             MR. KAUFMAN: Your Honor, Jack Kaufman for the
  5   Securities and Exchange Commission. Seated to my right is
  6   Linda Thomsen, head of the enforcement division. Seated to my
  7   left is Samuel Forstein, an assistant general counsel for the
                                Page 1
```

```
                                84ORSECH.txt
       19    recollection.  My recollection is that it was approved by the
       20    court, and that's what this document indicates.
       21             THE COURT:  What is the date of that order, Mr.
       22    Curran?
       23             MR. CURRAN:  December 14, 2006, your Honor.
       24    CROSS-EXAMINATION
       25    BY MR. CURRAN:
                          SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
                                                                          146
             84orsec3                    Friedman - cross
        1    Q.   I think you testified, and please tell me if I've got this
        2    wrong, that you believed you had a basis to, may I say, accrue
        3    monthly expenses over time.
        4    A.   Well, accrue, actually I wouldn't agree with the word
        5    "accrue."
        6    Q.   Accumulate?
        7    A.   No.  All I think I intended to testify is that if one has
        8    to, for example, pay an insurance premium on a monthly basis,
        9    one does not have to write the check every month.  One could
       10    write a check in month two for two months' premiums.  That's
       11    what I meant to say.
       12    Q.   In other words, the monthly expense would come after two
       13    months instead of one month?  In other words, let's take real
       14    estate taxes.  Withdraw that.
       15    A.   OK.
       16    Q.   On Exhibit A I think real estate taxes are listed as $5300.
       17    A.   Are we looking at the signed agreement, Mr. Curran?
       18    Q.   Yes.
       19    A.   Let me turn to that.  Yes, real estate taxes are listed at
       20    5300 on Exhibit A to Receiver Exhibit 1.
       21    Q.   You made the point before, I believe, that nobody, I guess
       22    maybe unless you have a mortgage, pays real estate taxes
       23    monthly.
       24    A.   Correct.
       25    Q.   So you basically didn't pay 5300 every month, you waited
                          SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300
                                                                          147
             84orsec3                    Friedman - cross
        1    until real estate taxes were due and then paid the full amount
        2    that was due?
        3    A.   I assume the "you" in that sentence was Mr. Saldutti.
        4    Q.   Yes.
        5    A.   I believe that's correct.
        6    Q.   I misspoke.  Now, where in the escrow agreement does it
        7    authorize doing what you did, in your judgment.
        8    A.   In my judgment, it authorizes it in 4(a), which says
        9    "Escrow agent shall distribute funds to the depositor so as to
       10    permit the depositor to pay the recurring expenses as set forth
       11    in Exhibit A."  That language does not contemplate that you
       12    have to pay your real estate taxes of 5300 every month even
       13    though you don't have a bill.
       14    Q.   That's how you read Exhibit A?
       15    A.   Yes.
       16    Q.   Did you ever discuss with Mr. Solow or Mr. Steinberg your
       17    reading that you have just testified to of Exhibit A?
       18    A.   I do not recall whether I did or not.
       19    Q.   Would you agree with me that the authorized expenses on a
       20    monthly basis were exceeded in some months?
       21    A.   If you mean the figure of 40,025, yes.
       22    Q.   Yes, I do.
       23    A.   Yes, then I would agree.
                                     Page 68
```

```
                            84ORSECH.txt
24   Q.  Indeed, I think you testified that the average, even if you
25   count in the months where there was less than 40,025, it was
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    148
     84orsec3                    Friedman - cross
 1   about 42,000?
 2   A.  I think I might have said 43.  That's my memory.
 3   Q.  I think you said 43 in connection with cost of living.
 4   A.  No.  Well, I may have.  But I think the answer is 43,000
 5   with respect to both categories.
 6   Q.  There was no provision in the agreement for an increase
 7   over the 40,025, was there?
 8   A.  It depends how one reads 4(a).  If your question is is
 9   there any explicit provision for seeking or giving notice or
10   seeking approval, that's correct, I agree with you.
11   Q.  No.  My question is, is there any explicit provision which
12   authorizes Mr. Saldutti to exceed $40,025 a month?
13   A.  Yes.
14   Q.  Beyond legal fees?
15   A.  I believe that 4(a) authorizes that.  And common sense I
16   would add.
17   Q.  How many dollars over 40,025, above that, could 4(a)
18   authorize, in your opinion?
19   A.  Could 4(a) authorize?
20   Q.  Yes.
21   A.  If the expenses were in the categories that were listed, I
22   think there is no limit under the agreement.  If Pound Ridge
23   real estate taxes doubled, I think Mr. Saldutti would be
24   authorized by 4(a) to pay those taxes.
25   Q.  Without talking to the receiver or his counsel?
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    149
     84orsec3                    Friedman - cross
 1   A.  That is certainly what I intended when I drafted the
 2   agreement.  It is the way I read the agreement.  It's the way I
 3   read the agreement today.  And it was never -- withdrawn.  I'll
 4   stop.
 5   Q.  Is there anything in the agreement which says that?
 6   A.  No.  I've already answered that, I thought.
 7   Q.  When you made a disbursement on a monthly basis to Mr.
 8   Saldutti, what documentation did you obtain from him before you
 9   made the disbursement?
10   A.  I obtained a request from him saying please disburse this
11   amount of money this month.
12   Q.  He just made an oral lump sum request?
13   A.  No.  I believe it was mostly emails.
14   Q.  Lump sum?
15   A.  Lump sum.
16   Q.  Didn't give you a breakdown?
17   A.  Correct.
18   Q.  Of what the expenses might be for?
19   A.  There are a couple of small exceptions to that at the very
20   beginning, but generally that's true.
21   Q.  In other words, please send me 50,000?
22   A.  Correct.
23   Q.  In the course of your stewardship, did you ever ask him for
24   any kind of a breakdown?
25   A.  I did not.  I'm not sure what you mean by my stewardship,
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    150
                                Page 69
```

```
                           84ORSECH.txt
     84orsec3              Friedman - cross
 1   but I did not. I would note that the second sentence of 4(a)
 2   says, "Depositor," that's Mr. Saldutti, "agrees to disburse all
 3   funds pursuant to this subparagraph (a) only in accordance with
 4   Exhibit A." Mr. Saldutti was well aware of that, and I never,
 5   ever, have had any reason to doubt Mr. Saldutti's integrity,
 6   including compliance with that provision of that agreement.
 7   Q.  Was there ever a time when you told Mr. Saldutti that a
 8   request he was making for distribution was not allowed or was
 9   excessive?
10   A.  Your Honor, I have no problem answering the question, but
11   I'm a little uncomfortable about inquiries into my
12   conversations with my client. As long as it's clear to
13   everybody that there is no waiver --
14            THE COURT:  It will not be deemed to be a waiver of
15   the attorney-client privilege.
16            MR. CURRAN:  Thank you.
17   A.  The answer to your question, Mr. Curran, is no, there was
18   never such a time.
19   Q.  In the email of May 14, '07, which you testified to
20   earlier, I think it's Receiver Exhibit I guess 2.
21   A.  I have it.
22   Q.  You said this sentence. "The difference is attributable to
23   expenditures permitted by the escrow agreement." I take it
24   that is consistent with your testimony here today that every
25   expenditure was consistent with the escrow agreement?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
                                                                   151
     84orsec3              Friedman - cross
 1   A.  Yes, that was my belief.
 2            MR. CURRAN:  If I've asked this, your Honor, and Mr.
 3   Friedman, I apologize.
 4   Q.  Your affidavit of I guess it was March 12 of 2008 has the
 5   distributions set forth.
 6   A.  Yes, I have that.
 7   Q.  Did you ever at any time between October 2005 and March
 8   2008 say to the receiver or to his counsel, I want to discuss
 9   with you some overages here in the distribution, or anything
10   like that?
11   A.  No, not that I recall.
12   Q.  In other words, your consistent position was that
13   everything you did, authorized him to spend, was in compliance,
14   in total compliance, with the escrow agreement?
15   A.  Yes.
16            MR. CURRAN:  Would your Honor bear with me one moment,
17   please?
18            THE COURT:  Take your time, Mr. Curran.
19            Mr. Curran, is this an appropriate time to take a
20   short recess?
21            MR. CURRAN:  I don't have much more, your Honor, but
22   it's up to the Court.
23            THE COURT:  Whatever your pleasure is.
24            MR. CURRAN:  We could take a short recess then.
25            THE COURT:  All right. We will reconvene in ten
                   SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
                                                                   152
     84orsec3              Friedman - cross
 1   minutes.
 2            (Recess)
 3   Q.  Look, please, at your chart that shows distributions, the
 4   first page to your affidavit.
```

```
                            84ORSECH.txt
10      is a more important point to be made here, and that is what
11      matters are the totals.  What you and I are talking about now
12      is just a timing issue.  But what is clear to me is that the
13      money in the legal fee column with a legal fees and the money
14      in the balance column was not legal fees.
15      Q.  So the totals are unquestionably accurate?  As best you can
16      do it, obviously.
17      A.  Yes.
18      Q.  Then why aren't individual items under "Balance of
19      Distribution "accurate?
20      A.  I believe they are.  But I know less about them, that's
21      what I'm saying.  You started this by asking me what accounts
22      for the 50,196.
23      Q.  Correct.
24      A.  I do not have any document or any knowledge independent of
25      a document that enables me to give you a precise answer.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                    155
        84orsec4                 Friedman - cross
 1      Q.  Don't I have a right to assume, based on this chart, that
 2      those moneys are not for legal fees?
 3      A.  Yes, I think that's accurate.
 4      Q.  The same for the 88,000?
 5      A.  I think that's accurate.
 6      Q.  I think you testified on direct examination, and please
 7      tell me if I have it wrong, that the specific items that are
 8      set forth as monthly expenses, like real estate, for example,
 9      real estate taxes, could change.
10      A.  Yes.
11      Q.  I think your point was they usually or normally would
12      change upwards.
13      A.  Yes.
14      Q.  Real estate taxes increase, and so on.
15      A.  Yes.
16      Q.  Is it your testimony that you felt that if there were
17      changes upwards, there was no need to inform the receiver or
18      his counsel of the fact that you were spending more money than
19      the items set forth in Exhibit A called for?
20      A.  Yes, as long as it's in the same categories.  Just like
21      it's my testimony that when there were changes downward, as
22      there were, for example, for tuition, which you see here as
23      $4500.  But when Mr. Saldutti's two daughters, who were in
24      college at the time this was entered into, graduated during the
25      life of this agreement, I didn't inform the receiver when there
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                    156
        84orsec4                 Friedman - cross
 1      were changes downward.  It was categories.
 2      Q.  At what point, if a category went haywire, would you think
 3      it was time to tell the receiver?  For example, miscellaneous
 4      expenses here are a thousand dollars.  Suppose they went to
 5      $5,000 for legitimate reasons.  Wouldn't you have an obligation
 6      under this agreement to tell the receiver you were increasing
 7      it by $4,000?
 8      A.  I think I probably would.  "Miscellaneous" is the term that
 9      I added at Mr. Steinberg's request when he asked me to take out
10      "tuition" and put in "miscellaneous."  Excuse me.  I said
11      "tuition."  I meant "contributions."  To the degree it really
12      is miscellaneous and not contributions, by definition
13      "miscellaneous" is a term that could mean anything, and I would
14      have informed the receiver if miscellaneous increased to 5,000.
                                  Page 72
```

```
                              84ORSECH.txt
15   Q.  How about recurring monthly family expenses?  That's fairly
16   broad.
17   A.  Yes.
18   Q.  Let's say that increased substantially.  Let's say it went
19   up by 3,000.  Would you feel an obligation to tell the
20   receiver?
21   A.  I would have to know why.  You're asking me questions in
22   the abstract that I can't answer in the abstract.
23   Q.  I think your testimony is that you believed that under the
24   agreement you could exceed the specific items set forth here if
25   the items called for more expense.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
                                                                  157
     84orsec4                Friedman - cross
 1   A.  That was a question that I answered when you asked me under
 2   the language of the agreement.  But I also have and take
 3   seriously a responsibility to the court and I also apply a rule
 4   of reason in everything I do.  So if some expense jumped in a
 5   way as to be inherently suspicious, I would want to know more.
 6   Q.  I think it is your testimony that section 4(a) of the
 7   agreement is what governs the decisions you've testified about.
 8   A.  Yes.  No.  Excuse me.  Let me answer that more accurately.
 9   Q.  Sure.
10   A.  Section 4(a) is the paragraph in the agreement that
11   governs, but there are other principles that govern the conduct
12   of all of us as lawyers, and I take those seriously.
13   Q.  What I meant was to exceed a monthly item as set forth in
14   Exhibit A, I believe it's your testimony that 4(a) authorized
15   you to do that when the expenses became greater.
16   A.  It is my testimony that 4(a) authorized me to do that for
17   expenses in the same category as long as they either increased
18   in an expected way or, if unexpected, I had an explanation for
19   them in the context of the receiver having originally wanted a
20   monthly accounting provision and then walking away from that
21   request.
22   Q.  That being the case and that being your thinking, wouldn't
23   it have been more prudent to raise with the receiver, or with
24   his counsel more likely, beforehand that these certain items
25   are estimates and not specific dollar amounts like they are in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
                                                                  158
     84orsec4                Friedman - cross
 1   Exhibit A?
 2   A.  They started out as specific dollar amounts in the first
 3   draft that I sent to the SEC, and then I rounded them at the
 4   request of the receiver.  I don't know what you mean by
 5   estimates.  They are not estimates.  They were rounded numbers
 6   based on actual experience except, as I indicated on the second
 7   page, for legal fees, which was an estimate, and health
 8   insurance.
 9   Q.  But if they could increase, as they apparently did, without
10   you telling the receiver or his counsel, wouldn't it have been
11   more prudent to give yourself some leeway for those increases
12   you were negotiating this agreement?
13   A.  Would it have been more prudent in 20-20 hindsight?
14   Q.  Yes.
15   A.  Sure, because then you wouldn't have asked me the question
16   you just asked me.
17   Q.  Did you request a cost of living increase to be included in
18   the agreement?
19   A.  No.  I think I should have, but I did not.
                               Page 73
```

84ORSECH.txt

```
20  Q.  Should you have requested a little more labeling of
21  estimations based on what your testimony has been?
22  A.  No, I don't agree with you, Mr. Curran, that they are
23  estimations.
24          MR. CURRAN:  I have no further questions, your Honor.
25          THE COURT:  Cross-examination, Mr. Forstein?
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

159

84orsec4                    Friedman - cross

```
 1          MR. FORSTEIN:  Yes, your Honor.
 2  CROSS-EXAMINATION
 3  BY MR. FORSTEIN:
 4  Q.  Mr. Friedman, did I correctly understand you to say that in
 5  terms of the instructions you received from your client for
 6  disbursements for particular months, what you would typically
 7  obtain was an email from him saying, give me X amount of money?
 8  A.  Yes.
 9  Q.  That's all?  There was no explanation of what the money was
10  for?
11  A.  Yes.
12  Q.  Where you have some of these expenditures for fairly large
13  amounts, such as, for example, January of '08, where he
14  requests $140,000 plus an amount for legal fees, so there's
15  $171,000, all you got from your client was an email saying
16  disburse $171,000 to me, with no explanation whatsoever?
17  A.  I believe that's true.  Of course, at the time I knew what
18  had been disbursed in the prior five months, including two
19  months with nothing.
20  Q.  You simply made an assumption when you received a request
21  for $171,000 that it was for correct amounts for each of the
22  categories in Schedule A?
23  A.  No, I did not make an assumption.  I believed that Mr.
24  Saldutti was complying with his obligations under the
25  agreement.  And if you're asking me did I audit my client, the
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```

160

84orsec4                    Friedman - cross

```
 1  answer is no, I didn't audit my client.
 2  Q.  For any of the distributions there are very considerable
 3  amounts, 135,000, 134,000.  In fact, let's look at August '07,
 4  $134,000 in August '07.  Or before that, in June and July, in
 5  June of '07 you've got 115,000, followed by 119,000 in July.
 6  Did either of those raise a question to you that perhaps your
 7  client was demanding that you give him more money than he was
 8  entitled to under the escrow agreement?
 9  A.  No.  If you look at the next column, there are significant
10  outstanding legal bills at that time.  If you look at the third
11  column in the two months you just mentioned, the total is
12  $84,000, or $42,000 a month.
13  Q.  Let me ask you to look at the footnote at the bottom of
14  that document.
15  A.  OK.
16  Q.  Tell me if I'm reading this correctly.  As I understand it,
17  when the escrow was first funded and the amount was put in,
18  that was done on October 25, 2005, is that correct?
19  A.  Does it say October 25th?  I don't remember the specific
20  date.  The chart indicates October.
21  Q.  Look at the footnote.  Does it say in the second sentence,
22  "The escrow account was established on October 25, 2005"?  Do
23  you see that, sir?
24  A.  Yes, it does.
```

84ORSECH.txt

```
 6    down for Allstate Insurance if under your reading of the
 7    agreement you were free to make any disbursement for insurance?
 8            THE WITNESS:  Your Honor, I think the answer to that
 9    is there has to be a starting point.  I was asked in the
10    negotiation process --
11            THE COURT:  Where is there an indication in this
12    agreement that this is the starting point?
13            THE WITNESS:  There is not an indication in this
14    agreement that this is a starting point.  But in my covering
15    letter to the SEC, in my February 16th letter, which is SEC
16    Exhibit 1, I said, "I will be supplying you as soon as I can a
17    list of Mr. Saldutti's debts and expenses."  So I am saying
18    these are the actual expenses, the historical expenses, because
19    I had been requested to do so.  That's what I mean when I say
20    starting point.  If you're entering into an agreement, you need
21    to know what it's currently costing.
22            THE COURT:  But in answer to a question from Mr.
23    Curran about miscellaneous expenses, you said, if I recall
24    correctly, that if there were $5,000 in miscellaneous expenses,
25    that would be something that would strike you as beyond the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

166

84orsec4                        Friedman

```
 1    breadth of this agreement and that you would likely bring it to
 2    the attention of the receiver.  Is that a fair
 3    characterization?
 4            THE WITNESS:  It is a fair characterization.  The
 5    history of that miscellaneous expenses is that it started life
 6    as charitable contributions.
 7            THE COURT:  I understand that.  The only thing that
 8    the receiver was concerned about was not the amount.  He wanted
 9    it changed.  He didn't like "charitable contribution."  He
10    wanted you to use the word "miscellaneous," right?
11            THE WITNESS:  Correct.
12            THE COURT:  That was his contribution to negotiating
13    part of the agreement, right?
14            THE WITNESS:  Right.
15            THE COURT:  Correct?
16            THE WITNESS:  Correct.
17            THE COURT:  You didn't suggest that.  He didn't like
18    seeing "charitable contributions" there, he wanted
19    "miscellaneous"?
20            THE WITNESS:  I guess.  He certainly suggested that.
21            THE COURT:  Now, you said that $5,000 in miscellaneous
22    would be something that would raise a red flag with you.  My
23    question is, how would you know whether Mr. Saldutti was
24    spending $5,000 on miscellaneous if he was not giving you any
25    representation on a monthly basis as to what area of monthly
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```

167

84orsec4                        Friedman

```
 1    expenses the moneys were aggregating to?
 2            THE WITNESS:  Because to the degree that the number in
 3    excess of the legal expenses was running significantly higher
 4    than the amount in the agreement, not in a month but over a
 5    period of months, I would have asked that question.
 6            THE COURT:  Where does it allow you to average
 7    expenses?
 8            THE WITNESS:  Your Honor, the word "averaging" does
 9    not appear and there is no specific authorization of that.  I
10    suggest to you that that is the fairest and most reasonable
```

```
                            84ORSECH.txt
16   know by a check.
17           THE COURT:  So the entire sum went to Saldutti; in the
18   case of January '08, you sent 171,000 to him by wire?
19           THE WITNESS:  Correct.
20           THE COURT:  Then he wrote you a check for $30,475.49,
21   is that correct?
22           THE WITNESS:  Yes.  The only thing that I can't tell
23   is could the check have been written before the wire.  That's
24   possible, because this is on a month basis.  But subject to the
25   specific day, your Honor --
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                       170
     84orsec4                      Friedman
 1           THE COURT:  Was there only one wire a month?
 2           THE WITNESS:  There are a small number of months in
 3   which there are two wires and the distribution amount column
 4   represents the total.  I think that's true of only two or at
 5   most three months.
 6           THE COURT:  With respect to the entire $1,216,771.41
 7   that Mr. Saldutti kept, you don't have any record as to what he
 8   spent it on?
 9           THE WITNESS:  I do not, but he does.  Actually, to be
10   honest, your Honor, in preparation for this testimony, for this
11   hearing, I do.  But it was not a record that I kept
12   contemporaneously, to answer your question completely.
13           THE COURT:  Through your counsel you offered a whole
14   series of exhibits that showed different reiterations of the
15   escrow agreement.
16           THE WITNESS:  Yes.
17           THE COURT:  Starting with your initial effort on March
18   9, 2005.
19           THE WITNESS:  Right.
20           THE COURT:  Am I correct to understand that your
21   initial negotiations regarding an escrow agreement started with
22   the SEC?
23           THE WITNESS:  Yes.
24           THE COURT:  And it was the SEC that sought an escrow
25   account from you?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                       171
     84orsec4                      Friedman
 1           THE WITNESS:  I may have volunteered it.  But if you
 2   mean SEC as distinct from the receiver, yes.
 3           THE COURT:  Yes.
 4           THE WITNESS:  Yes.
 5           THE COURT:  There was a time in February of '05 when
 6   you didn't know exactly what was going to happen with your
 7   client, what the SEC was going to do, correct?
 8           THE WITNESS:  Sure, yes.
 9           THE COURT:  You were concerned that the SEC might try
10   to obtain an asset freeze against your client and all of his
11   property, right?
12           THE WITNESS:  Yes.
13           THE COURT:  You were having discussions with whom?
14   Mr. Arnold?  Who are these people?
15           THE WITNESS:  Mr. Karpati, Mr. Arnold, and Ms. Kolb.
16           THE COURT:  Who is Mr. Arnold?
17           THE WITNESS:  He was a lawyer at the SEC.  If you're
18   asking me his title, I don't know.
19           THE COURT:  How about Ms. Kolb?
20           THE WITNESS:  She was a lawyer at the SEC.  The
                                 Page 79
```

```
                             84ORSECH.txt
 7   Q.  No one ever said that $40,025 a month was too much?
 8   A.  No one ever said that.
 9   Q.  Neither the SEC nor the receiver?
10            THE WITNESS:  Correct.
11            THE COURT:  The SEC saw all of these drafts, too,
12   didn't they?
13            THE WITNESS:  They are on the emails of the drafts.  I
14   can't say who looked at them.
15            THE COURT:  As we know from the attorney's fee
16   applications, no one.
17            With respect to legal fees, did you ever have a
18   discussion with either the SEC or the receiver about what the
19   maximum amount of legal fees might be?
20            THE WITNESS:  No.
21            THE COURT:  Did they ever ask?
22            THE WITNESS:  No.
23            THE COURT:  Did they ever say to you in words or
24   substance, you know, if the fees are twice the amount
25   contemplated in Schedule A, I think you should tell us?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    179
     84orsec4                       Friedman
 1            THE WITNESS:  No.
 2            THE COURT:  Or words to that effect?
 3            THE WITNESS:  No such conversation.
 4            THE COURT:  Did you ever tell the receiver or the SEC,
 5   in words or substance, you know, this litigation is costing my
 6   client a fortune?
 7            THE WITNESS:  I don't have a specific recollection,
 8   but I certainly would not be surprised.  Mr. Solow and I have
 9   had lots of conversations, and I'm sure I said that somewhere.
10            THE COURT:  Do you have any understanding as to why it
11   took from March 9th to the end of August to get this escrow
12   agreement signed?
13            THE WITNESS:  No, other than the sequence of dates in
14   the documents.  But my answer is no.
15            THE COURT:  Do any counsel have any further questions
16   that they want to pose to Mr. Friedman?
17            MR. CURRAN:  I do not, your Honor.
18            MR. FORSTEIN:  I do, your Honor.
19            THE COURT:  Go ahead.
20   BY MR. FORSTEIN:
21   Q.  Mr. Friedman, the judge asked you about Defendant's Exhibit
22   E.  Did you have that in front of you?
23   A.  Bear with me.  Can you identify it?
24   Q.  The July 1 email attaching, among other things, a side
25   letter.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    180
     84orsec4                       Friedman
 1   A.  Yes, I have it.
 2   Q.  Would you look at the proposed side letter, the second and
 3   third pages of the document dated July blank 2005.
 4   A.  Yes.
 5   Q.  Do you have that?
 6   A.  I do.
 7   Q.  Do you see, in paragraph numbered 1 on the first page of
 8   the document, the last line of that provision saying, "If his,
 9   referring to Mr. Saldutti, "total actual expenditures are less
10   than his total budgeted expenditure, Mr. Saldutti shall be
11   permitted to use any such excess in future months"?
                                Page 83
```

```
                                84ORSECH.txt
12    A.  I see that.
13    Q.  A side letter containing such a provision was never
14    executed in this case, was it?
15    A.  Correct.
16    Q.  That language or language similar to that never made its
17    way into the escrow agreement, did it?
18    A.  Correct.
19              MR. FORSTEIN:  That's all, your Honor.
20              THE COURT:  Anything further?
21              MR. CURRAN:  No, sir.
22              THE COURT:  Ms. Renzin?
23              MS. RENZIN:  No.
24              THE COURT:  Mr. Friedman, you're excused.  You can
25    step down.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
                                                                      181
      84orsec4
 1              (Witness excused)
 2              THE COURT:  And you can call your next witness.
 3              THE WITNESS:  Could you give me a minute break?
 4              THE COURT:  We'll take five minutes.  Because everyone
 5    is here and I'd like to finish this hearing today, we'll
 6    continue past 5 o'clock so we can complete the taking of
 7    testimony in one day.  Obviously, I'll permit the parties to
 8    call witnesses in rebuttal.
 9              (Recess)
10              MR. FRIEDMAN:  Your Honor, the Salduttis are here.
11    They are available to answer any questions that the Court has.
12    But in light of how much time we have gone on and the detail of
13    some of my testimony, it is not my intention to call them
14    unless your Honor wants to hear from them.  Therefore, I would
15    rest subject to your Honor's desire to hear from them.
16              THE COURT:  I think we need to hear from them.  Before
17    we do, I have one other question for you, Mr. Friedman, which
18    you can answer from right there.  At any time during the
19    process did you resist the idea of having Mr. Saldutti enter
20    into an escrow agreement with respect to his money?
21              MR. FRIEDMAN:  No.  I resisted certain terms, but I
22    did not resist the idea of an escrow agreement.
23              THE COURT:  You proposed an escrow agreement to the
24    SEC the day they filed their litigation, is that correct?
25              MR. FRIEDMAN:  I don't know if it was the exact day,
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
                                                                      182
      84orsec5
 1    but it certainly was in the same time frame.  I don't remember
 2    when they filed their litigation.
 3              THE COURT:  Very well.  Thank you.
 4              MR. FRIEDMAN:  If your Honor thinks it's important,
 5    I'll call Mr. Saldutti as my next witness.
 6              THE COURT:  I think it's important.
 7              MR. FRIEDMAN:  If your Honor will bear with me for one
 8    minute.  I just want to make sure I have the right exhibits.
 9              THE COURT:  Go ahead.
10     FRANCIS SALDUTTI,
11         called as a witness on his own behalf,
12         having been duly sworn, testified as follows:
13              THE COURT:  State your full name for the record and
14    pull up your chair and speak into the microphone so everyone
15    will hear you.
16              THE WITNESS:  Francis Saldutti, S-A-L-D-U-T-T-I.
                                  Page 84
```

```
                             84ORSECH.txt
 3   Q.  You mentioned upkeep, and the 4900 on the chart is shown as
 4   mortgage and upkeep.  Are you saying that 4900 was only the
 5   mortgage and not the upkeep?
 6   A.  That's correct.
 7   Q.  When you say "upkeep," what do you mean, what kinds of
 8   things?
 9   A.  Utilities, of which there were many.  The category is
10   broad, far-ranging.  But I can tell you that, if memory serves
11   me, those expenses excluded a total that ran between -- it
12   ranged from 300 a month to 900 a month depending upon season.
13   Obviously, in the summer it was far higher, in the winter much
14   lower.
15   Q.  Is it your testimony that in order for Exhibit A to be
16   accurate and complete, there should have been a number in
17   addition to the 4900 for upkeep?
18   A.  That 300 to 900 per month.
19   Q.  You also said that the exhibit was incorrect with regard to
20   the $125 for homeowner's insurance.  Do you see that?
21   A.  Yes.
22   Q.  In what respect was that incorrect?
23   A.  Homeowner's is actually 191.50 a month, not 125.
24   Apparently, it either never was 125 or was a long time ago 125.
25   Q.  Was it 191.50, to your knowledge, in August of 2005, when
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

190

```
     84orsec5                     Saldutti - direct
 1   the escrow agreement was signed?
 2   A.  Either then or close to then.
 3   Q.  Are there any other items on Exhibit A which were incorrect
 4   when Exhibit A was signed, to your knowledge?
 5   A.  Not to the best of my knowledge.
 6   Q.  Are there any other items on Exhibit A which have increased
 7   materially subsequent to the entry of Exhibit A?
 8   A.  The recurring monthly family expenses.
 9   Q.  That figure is shown as $11,000 on the exhibit?
10   A.  It is.
11   Q.  Do you know what the number has in fact been?
12   A.  If memory serves me, it averaged about $1825 more than
13   that.
14   Q.  $1825 per month?
15   A.  Per month, correct.
16   Q.  Can you explain why the 11,000 turned out to be lower than
17   the actual cost over the life of the escrow agreement.
18   A.  There are numerous explanations.  For example, once Arden
19   ceased operations, we no longer had dental coverage and we
20   incurred in subsequent months and years significant dental
21   expense.  So it was all paid out-of-pocket.
22           We did not purchase any automobiles, obviously, since
23   all of this came down, and as a consequence all of our cars
24   exceeded the 50,000 mile warranties and we incurred somewhere
25   between significant and in some cases major repair expense on
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

191

```
     84orsec5                     Saldutti - direct
 1   those automobiles.
 2           Another example would be last year I actually had a
 3   taxable income.  In 2006 we had to pay for a tax preparer that
 4   we didn't have to pay for prior to that time.
 5           We incurred expense having to pay an attorney who had
 6   represented us in the creation of our estate right after the
 7   business was sold and who was helping us with our charitable
                                Page 88
```

```
                            84ORSECH.txt
 8    giving program. While we didn't incur any additional expense
 9    from him for those purposes, the SEC had contacted him,
10    interviewed him, he prepared documents, had conversation, and
11    we were billed for that.
12             They are the kinds of things that totaled into the
13    monthly number that could not have been anticipated.
14    Q.  Were there any amounts in Exhibit A which were lower in
15    point of fact than shown on the exhibit -- withdrawn -- which
16    became lower over time than shown on the exhibit?
17    A.  Here's one, health insurance. Because Arden's cessation of
18    business cut out all of our medical benefits, we had to pay for
19    health insurance. I think at the time of this document
20    creation, we anticipated -- it was an estimate because we
21    simply didn't know what it was going to cost us -- we
22    anticipated $3,000 a month in health care coverage. In fact, I
23    think we obtained it for 2350 a month or something like that.
24    But unfortunately, even that has gone up and is probably at the
25    $3,000 mark now.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                     192
       84orsec5                    Saldutti - direct
 1    Q.  Let me direct your attention to the fourth line, which says
 2    tuition for children 4,500. Do you see that?
 3    A.  Yes.
 4    Q.  Has that changed over the life of the escrow agreement?
 5    A.  Yes.
 6    Q.  Can you explain how, please.
 7    A.  Both my daughters have graduated from college, one in 2006
 8    and one in the summer-fall of 2007, so those tuitions no longer
 9    are paid.
10    Q.  Since the time the escrow agreement was entered into, has
11    there been a change in your lifestyle and your family's
12    lifestyle?
13    A.  Yes.
14    Q.  Can you describe the respects in which that lifestyle has
15    changed.
16    A.  We just spend, wherever we can, far less than we ever did.
17    How did we do that? We immediately suspended a construction
18    project on the house that still sits half done, wires hanging
19    out of the ceiling, out of the walls, unpainted. We suspended
20    a decorating project. The house needs painting, we haven't
21    done it. The fence needs painting, we haven't done it.
22             We don't buy birthday gifts, we don't buy Christmas
23    gifts. Vacations, we haven't paid for a vacation. We did get
24    taken on two trips, one of which we paid for airfare, the other
25    we used miles. But on neither occasion did we pay for lodging.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                     193
       84orsec5                    Saldutti - direct
 1    we down-shifted considerably.
 2    Q.  Have you purchased any cars?
 3    A.  No.
 4    Q.  Have you purchased any furniture?
 5    A.  No.
 6    Q.  Have you purchased any appliances?
 7    A.  No.
 8    Q.  Have you made any what might be called major household
 9    purchases?
10    A.  No, none at all.
11    Q.  You have three children, right?
12    A.  I do.
                                Page 89
```

```
                               84ORSECH.txt
19            THE COURT:  Mr. Forstein, cross-examination?
20   CROSS-EXAMINATION
21   BY MR. FORSTEIN:
22   Q.  Mr. Saldutti, with respect to the expenses that you say
23   turned out to be more than are set forth on Schedule A of the
24   escrow agreement, did it ever occur to you that the receiver or
25   the receiver's counsel or the SEC should be notified that the
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                     209
     84orsec5                     Saldutti - cross
 1   amounts in fact were different from the amounts in Schedule A?
 2   A.  It did not occur to me.
 3            MR. FORSTEIN:  Nothing further, your Honor.
 4            MR. FRIEDMAN:  I have nothing further, your Honor.
 5            THE COURT:  Mr. Saldutti, what was your understanding
 6   of the purpose of specifying dollar amounts in Exhibit A to the
 7   escrow agreement?
 8            THE WITNESS:  I believed that we were setting forth a
 9   budget that I had been asked to, with my wife's help,
10   calculate, and from that an escrow account was going to be
11   determined or accommodated.
12            THE COURT:  Did you have any understanding as to
13   whether or not the monthly expenses were caps?
14            THE WITNESS:  No.  I was never told that and that was
15   not my understanding.  Had I thought about it, if you're asking
16   me in hindsight, I wouldn't have guessed that they were caps
17   because each number was subject to upward revision just based
18   on inflationary trends.
19            THE COURT:  You're a sophisticated business person.
20   You read the agreement, right?
21            THE WITNESS:  I did.
22            THE COURT:  Does the agreement provide for any
23   adjustments for inflation?
24            THE WITNESS:  It did not.  Neither did it offer that
25   the numbers were capped.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
                                                                     210
     84orsec5                     Saldutti - cross
 1            THE COURT:  I come back again, though, to the
 2   question:  What was your understanding of the purpose of
 3   putting any numbers down?  You and your wife were asked by your
 4   attorney to come up with a budget of what you needed, am I
 5   correct in that?
 6            THE WITNESS:  You are.
 7            THE COURT:  Am I also correct that the only money that
 8   was available to you to meet your monthly expenses was the
 9   money that you were agreeing to put into the escrow account,
10   short of invading your Keogh or your IRA or some other
11   retirement fund?
12            THE WITNESS:  I did.
13            THE COURT:  The only money that was available was this
14   money that you were putting into the escrow account?
15            THE WITNESS:  Correct.
16            THE COURT:  With respect to legal fees, there was a
17   statement that this was just an estimate.  Why didn't you
18   request some footnote with respect to the other expenses?
19            THE WITNESS:  In all candor, Judge, I must tell you
20   that at the time that we were requested to calculate monthly
21   expenses and put it in budget form and become subject to an
22   escrow account, not in a hundred thousand years did I dream
23   this was going to happen.  I did not know, I couldn't even
                                  Page 97
```